**SUZUKI MOTOR CORPORATION and American Suzuki Motor Corporation, Plaintiff–Appellant,**

**v.**

**CONSUMERS UNION OF UNITED STATES, INC., a non-profit New York Corporation, Defendant–Appellee.**

No. 00–56043.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed May 19, 2003.

Robert B. Fiske, Jr., Michael P. Carroll, William C. Komaroff, Davis, Polk & Wardwell, New York, NY, Gene S. Schaerr,

David J. Lewis, Paul J. Zidlicky, Michael S. Lee, Sidley & Austin, Washington, DC, James Harris, Sidley & Austin, Los Angeles, CA, George F. Ball, Newport Beach, CA, for the plaintiff-appellant.

Michael N. Pollet, Pollet & Felleman, Yonkers, NY, for the defendant-appellee.

John H. Clarke, Washington, DC, for amicus curiae Accuracy in Media, Inc.; Kieran P. Fallon, Miami, FL, for amici curiae Bill Seidle Suzuki, Bob Lewis Suzuki, David O'Neal Suzuki, Five Star Suzuki, Jim Hudson Suzuki, and Roger Beasley Suzuki; and Richard A. Samp, Washington, DC, for amicus curiae Washington Legal Foundation, all seeking reversal.

Before FERGUSON, TASHIMA, and GRABER, Circuit Judges.

### ORDER

The opinion and dissenting opinion, filed June 25, 2002, slip op. at 9009, 292 F.3d 1192, are withdrawn and replaced by the amended opinion, concurring opinion, and dissenting opinion filed concurrently with this order. With these amendments, the panel has voted to deny the petition for rehearing en banc, with Judge Ferguson recommending that the petition be granted.

The full court was advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. On such vote, a majority of the nonrecused active judges failed to vote in favor of en banc rehearing.*

The petition for rehearing en banc is denied.

* Judge Rawlinson was recused.

KOZINSKI, Circuit Judge, with whom PREGERSON, REINHARDT, T.G. NELSON, MICHAEL DALY HAWKINS, THOMAS, McKEOWN, WARDLAW, WILLIAM A. FLETCHER, FISHER and BERZON, Circuit Judges, join, dissenting from denial of rehearing en banc.

For over half a century, Consumers Union has been testing and rating consumer products and publishing the results in its magazine, Consumer Reports. A significant portion of the American public relies on CU's ratings on a regular basis, and almost everyone consults Consumer Reports now and then before making a significant purchase—whether a sound system, a dishwasher or a car. What makes CU's ratings particularly useful is the thorough explanation of the testing procedures employed, which lets consumers judge whether the ratings fairly represent the product.

The Suzuki Samurai article, the subject of this lawsuit, is no exception. Running some 6500 words, it tells readers precisely how CU came to conclude that "The Suzuki rolls over too easily," starting with an incident during the vehicle's break-in period where the Samurai "flopped over on its side" during a low-speed maneuver. The explanation is not written for morons; like other CU reviews, it is geared to an intelligent, informed consumer. Yet the careful reader will not fail to understand the central facts that undergird Suzuki's claim in this lawsuit, namely, that the Samurai did well on CU's standard course, that CU then modified the course to make it more challenging and, as a result, the Samurai did far worse than its competitors.

I find it incomprehensible that a review truthfully disclosing all this information could be deemed malicious under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). If CU can be forced to go to trial after this

thorough and candid disclosure of its methods, this is the death of consumer ratings: It will be impossible to issue a meaningful consumer review that a band of determined lawyers can't pick apart in front of a jury. The ultimate losers will be American consumers denied access to independent information about the safety and usefulness of products they buy with their hard-earned dollars. The majority sets a dangerous precedent, and the full court errs grievously by failing to take the case en banc to correct the error.

1. The majority's analysis is tainted throughout by its failure to articulate, much less apply, a coherent theory of the "independent examination" rule, a key element of the *New York Times* regime. When a public figure sues his critics for defamation, we "must 'make an independent examination of the whole record,' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 285, 84 S.Ct. 710 (citation omitted). This rule "assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).[1] It is "a rule of federal constitutional law" that "reflects a deeply held conviction that judges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Id.* at 510–11, 104 S.Ct. 1949.

We have heretofore sensibly assumed that the independent examination rule calls for us to do something more than we would normally do. After all, it hardly "preserve[s] the precious liberties established and ordained by the Constitution" to treat a First Amendment case the same as a slip-and-fall. When we review a jury verdict under *New York Times*, we don't "independently examine" the record merely by considering all the evidence—we already do that in every case anyway. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."). Nor do we merely review de novo the trial judge's determination whether a jury question exists—again, we already do that in every case. *See Janes v. Wal–Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir.2002) ("We review a district court's denial of a motion for judgment as a matter of law *de novo* ...."). First Amendment independent examination is an *additional* protection that the Constitution affords publishers.

Where there are genuine evidentiary disputes over particular factual predicates of actual malice—such as questions about a witness's credibility—the issue is for the jury. The judge does not weigh the evidence to find those historical facts, but instead makes a routine sufficiency determination. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After resolving the predicate factual disputes in the plaintiff's favor, however, the judge must take the further step of independently "determin[ing] whether the record establishes actual malice with convincing clarity." *Bose*, 466 U.S. at 514, 104 S.Ct. 1949; *see Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997).[2] And *that* process is not a routine sufficiency determination, because it *does* involve weighing the evidence. If it did

---

1. For discussion of the need for independent appellate review in the context of copyright, see Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431 (1998).

2. Independent examination is, of course, a one-way street: If the jury *rejects* a plaintiff's

not, the independent examination rule would be meaningless.

The majority ignores these principles and instead treats the rule as nothing more than de novo review of the trial judge's sufficiency ruling. On this theory, independent examination is exactly what we do whenever we consider a trial judge's determination that a case does not present a triable issue. Of course, de novo review in this sense actually hurts CU because the district court sided with it below.

The majority relies on *Bose* and *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir.2001), for the point that independent examination means the same thing as de novo review. But those cases involved a very different use of the term: not de novo review of the lower court's sufficiency-of-the-evidence determination, but de novo review of the underlying question whether the defendant acted with actual malice. The former type of review is what we do in every case where a party appeals a grant of summary judgment or a denial of judgment as a matter of law. It's the latter type—weighing the evidence on the ultimate question of actual malice— that constitutes independent examination.[3]

The majority seems willing to concede that independent examination has some

bite after the verdict. But it refuses to "conflate[ ]" this post-verdict standard with the summary judgment one. Am. op. at 1132. By decoupling the two standards, the majority conflicts directly with Supreme Court precedent. As the Court explained in *Anderson*, "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." 477 U.S. at 249, 106 S.Ct. 2505. Because the court must ultimately review a plaintiff's verdict under the independent examination rule, it necessarily follows that it must apply that same standard at summary judgment.

The practical effect of the panel's decision is that our review for sufficiency at summary judgment is now governed by one standard, while our review after a jury verdict is governed by another. Cases will now often proceed to trial, even though the court can tell ahead of time that the plaintiff's evidence will not support a jury verdict under *New York Times*. What possible purpose is served by conducting such mock trials? Are they held just in case new evidence materializes midway through trial? Or merely to give the lawyers trial experience? I know of no other context where we allow a plaintiff to get to trial with a factual record that will not support a verdict in his favor.[4]

---

claim, a judge may not invoke the rule to resurrect it.

**3.** The majority's confusion may stem from the fact that *Bose* and *Hoffman* were appeals from bench trials. Where the district court is the factfinder, de novo review of its opinion is also de novo review in the *New York Times* sense because it's effectively de novo review of the underlying question of actual malice. But where the district court merely makes a sufficiency determination—whether on summary judgment or post-verdict—de novo review of its opinion is *not* de novo review in the *New York Times* sense. We always review sufficiency determinations de novo; indepen-

dent examination means doing something more.

**4.** Judge Graber is of course correct that "[t]he evidence presented at trial often differs markedly from that which is offered in a party's summary judgment papers." Concurrence at 1140. That a plaintiff defeats a summary judgment motion doesn't guarantee that the evidence at trial will support a verdict in his favor. What's novel about the majority's approach is that it reverses the rule: It lets a plaintiff defeat summary judgment with a record inadequate to support a verdict, on the mere speculation that some evidence at trial—as yet unknown—will materialize to support his case.

The omnipresent danger in defamation suits is that "would-be critics ... may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times,* 376 U.S. at 279, 84 S.Ct. 710. That a plaintiff's suit ultimately fails after trial is little solace to a defendant crushed by the sheer expense of litigation. For example, in this suit and a similar one filed by Isuzu, *see Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 66 F.Supp.2d 1117 (C.D.Cal.1999), Consumers Union had by September 1999 reportedly spent more than $10 million defending its ratings, while its two adversaries had spent more than $25 million. *See* John O'Dell, *Bruising Tests Await Consumer Reports in Court,* L.A. Times, Sept. 19, 1999, at A1. And these are just two of the many lawsuits CU has had to contend with—about a dozen published cases (and who knows how many unpublished ones) involving disgruntled CU reviewees seeking revenge through the courts. Good for lawyers, but not so good for free expression.

It's no answer to let the chips fall and assume that insurance will cover the tab. Insurance makes costs more predictable, but it doesn't decrease the amount publishers must pay to do business in the long term. If publishers present a greater liability risk, insurers will charge higher rates. The burden on free speech is no less intolerable.

Even when First Amendment values do not hang in the balance, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). That principle is all the more vital where a slow and expensive determination will result in self-censorship.

Where a plaintiff's evidence is strong enough to support a verdict, the publisher must stand trial. But there is no sensible reason to impose such onerous costs on a publisher where the plaintiff is doomed to fail. Allowing a plaintiff to get to trial on a record that will not support a verdict under *New York Times* does not make sense, and if some of the Court's precedents can be read to suggest this result, the Court would do us all a great favor by explaining that it intended no such absurdity.

**2.** Had the majority applied the constitutionally required standard, it could not have reached the result it did.[5] Suzuki's case is easily summarized. Its first theory is that CU knew it was probably lying because its employees tried to make the Samurai tip and were happy when they succeeded. The second is that CU purposely avoided the truth by failing to address a potential source of experimental error. Neither of these theories withstands serious scrutiny.

As to the first, the majority relies heavily on the fact that CU switched to the short course after the long course failed to cause any tips. The initial problem with this theory is that CU fully disclosed this in its article. Just so we're clear what we're talking about, here's what CU told the public:

> Our regular test program includes a maneuver designed to see how controllable a car remains when a driver is forced to steer sharply—to avoid, say, a child who unexpectedly darted into the

---

**5.** I use the term "majority" loosely because Judge Graber never tells us which parts of Judge Tashima's opinion she relies on to find actual malice.

road. To simulate that kind of sudden emergency, our drivers run each car through a lane-changing course marked off by traffic cones. The drivers begin their left turn out of the lane 60 feet before the obstacle. They then must steer sharply enough to get back into the lane no more than 60 feet beyond the obstacle. ·

. . . .

Under the experienced touch of our drivers, all four utility vehicles got through the course at 52 mph or better. The *Suzuki Samurai* was actually more maneuverable than the others, since it's so much smaller and lighter.

With concern about a potential rollover somewhat allayed, a staff member who does not normally drive the course tried to steer the *Suzuki* around the obstacle. All went well for several runs at moderate speed. Then, on a run at 45 mph, the driver made a slight steering misjudgment: He turned wider than necessary to clear the obstacle, something many ordinary drivers might do in an emergency turn. That forced him to turn back a bit more sharply than our regular testers had. As he turned the steering wheel to the right to get back into lane, the *Suzuki* teetered to the left. The two right-side tires lifted about a foot off the pavement before the driver was able to bring the vehicle back under control.

. . . .

Would the other utility vehicles show similar instability if steered the way the *Suzuki* had been steered?

To find out, we put all the vehicles through a slightly different maneuver. We realigned the cones so that our test drivers had to start the turn 50 feet from the obstacle instead of 60 feet from it. That meant they needed to steer around the obstacle and back into lane

in a total of 110 feet rather than the usual 120 feet. We also moved the obstacle three feet farther to the left.

. . . .

In this more demanding test, the *Isuzu Trooper,* the *Jeep Wrangler,* and the *Jeep Cherokee* began knocking over cones at about 40 mph. But they remained stable. We also tried the *Jeep Wrangler* without the outriggers. Still stable.

The *Suzuki Samurai,* by contrast, toppled onto the outriggers when turned through the course at about 40 mph. Without the outriggers, it would have rolled over.

During the period we were testing these vehicles, Suzuki introduced a modified version of the *Samurai,* a "1988 1/2" model with a softened suspension. We acquired the latest version and ran it through the same accident-avoidance maneuver. It proved even less stable than the *Samurai* we originally tested. The front right wheel lifted in turns at low speed. And the vehicle rolled onto the outriggers at 38 mph.[6]

CU thus thoroughly explained both its track design and its testing procedure. It acknowledged that the Samurai did well on the standard course and alerted the reader that CU designed a new course specifically to force a maneuver it had reason to believe the Samurai would fail. Even assuming CU wanted to make the Samurai tip and designed its short course to achieve that result, so what? The fact remains that the Samurai *did* tip—several times—while every other vehicle run through the same course did not tip even once. This is certainly something consumers would want to know before deciding which of these vehicles to put their families in.

6. The introductory explanation to the article is reprinted in full in the appendix.

By exposing CU to liability for basing its negative opinion of the Samurai on a fully disclosed testing procedure, the majority runs head-first into a settled First Amendment principle: " 'Where a publication sets forth the facts underlying its statement of opinion ... and those facts are true, the Constitution protects that opinion from liability for defamation.' " *Standing Comm. v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (quoting *Lewis v. Time, Inc.*, 710 F.2d 549, 556 (9th Cir.1983)); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir.1995) ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."). The logic behind the rule is straightforward and unassailable: When a publisher prints an opinion but doesn't state the basis for it, the reader may infer a factual basis that doesn't exist. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). But when a publisher accurately discloses the facts on which he bases his opinion, the reader can gauge for himself whether the factual basis adequately supports the opinion.

This is not a case where a defendant fabricates results and then purports to rely on them—like when NBC secretly strapped rockets to GM trucks with side-mounted fuel tanks to make them explode in collisions. *See* Jane Hall, *Chief of NBC News Quits in Wake of Rigged Crash*, L.A. Times, Mar. 3, 1993, at A1. There's not a shred of evidence that the short course was clandestinely altered to make it more forgiving when the other vehicles went through, or that CU's drivers intentionally soft-pedaled the runs with the other vehicles to make the Samurai look worse by comparison. The majority's gripe here is not with CU's reporting of its tests, but with its experimental design, and that is entirely the wrong focus. If CU had found the Samurai "Not Acceptable" based on tests performed with a Ouija board, most

consumers would dismiss its rating as worthless. But, so long as CU disclosed its method, the report would be protected by the First Amendment.

Even aside from the fact that CU fully disclosed its change in course, there is simply nothing improper about what it did. When CU first tested the Samurai on the long course, it didn't tip—a result consistent with the theory that it is safe, but also consistent with the theory that the long course is not challenging enough to detect the Samurai's design flaw. CU did what any conscientious researcher would do and redesigned its experiment to focus on the conditions that seemed more likely to detect a flaw. *See, e.g.*, Karl R. Popper, *The Logic of Scientific Discovery* 45 (Hutchinson rev. ed.1968) (1934) (noting that a scientist, after first detecting a condition, "might try to rearrange his experiments so as to make the effect reproducible"). It then ran the Samurai and several other vehicles through the course and found that the Samurai had a dramatically higher propensity to roll over—it tipped on several occasions while no other vehicle tipped once.

The opinion makes much of the fact that CU had used its long course for testing since 1973, but cites no evidence it was using the course for *rollover* testing during that time. In fact, the evidence in the record suggests the contrary: None of the 500 vehicles CU had previously tested had rolled over, and it did not even use safety outriggers to protect its drivers from rollovers until the tests in question. Clearly, CU had not previously focused on this particular risk, no doubt because the original test course was designed before SUVs and similar vehicles with high centers of gravity had come into vogue. But after news stories and a NHTSA filing highlighted the Samurai's rollover propensity, after the vehicle rolled over once during

break-in, and after it tipped *again* following formal testing on the long course, CU had good reason to change focus. Adjusting test procedures to better detect a risk arising from new consumer preferences is hardly reprehensible. It is precisely what one would expect from researchers seriously interested in consumer safety.

Consider an analogy: Assume CU has been testing clothes dryers using a standard load since 1973. It learns that a particular brand of dryer occasionally causes fires. CU dries several standard loads but experiences no adverse results, so it tries a few loads with more flammable materials—say, acetate bed-linens. This is not part of its existing testing protocol, but the materials are ones that consumers have begun to use more often in recent years. If the materials catch fire in the one dryer but not the others, is CU's test a fraud because it changed its procedure to focus on the new risk?

The relevant question in either case is not whether the new procedure is different from the old, but whether it accurately reflects conditions consumers might occasionally face. And the majority points to no evidence at all on *that* score. The short course was not some extraordinary challenge that no consumer vehicle could be expected to pass—after all, every other tested vehicle did pass it. CU's previous use of the long course has no bearing on whether its short course results were fraudulent.

By equating CU's switch to a short course with knowledge of probable falsity, the majority ignores the realities of experimental design. Scientific inquiry would grind to a halt if researchers couldn't tink-

er with their methods as they learned new information about the object of their study. CU's switch is not even bad science, let alone bad journalism, and certainly not journalism so awful that it loses First Amendment protection. To be probative of actual malice, evidence must have at least some tendency to exclude obvious innocuous explanations for the defendant's conduct. CU's switch from a long course to a short course does not.[7]

That leaves the majority with no direct evidence that CU's methods were flawed, and only four contemporaneous statements of CU employees—"If you can't find someone to roll this car, I will," an unspecified cheer, "That's it. That looked pretty good," and "All right Ricky baby"—that, to the majority, show an unfair bias against the Samurai. If CU had a negative view of the Samurai going into the tests, the reasons are not hard to imagine—the Samurai had already been slammed in the press for its rollover propensity, had been the target of a safety complaint filed with NHTSA and had rolled over on its side while a CU employee drove it at only 15 mph. But even if CU's preconception were entirely arbitrary, these fleeting remarks—three of which are no more than inane schadenfreude—would still be insufficient to support a finding of actual malice.

Actual malice is not bias. "[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard." *Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (internal quotation marks omitted). Speech that is "malicious" only in the sense that the speaker is

---

7. The majority also relies on the fact that the driver who made the Samurai tip the first time was not one of CU's regulars. This fact was also disclosed in CU's article, *see* p. 1116 *supra,* and, in any case, it's hard to see why it matters. Presumably, consumers driving the

Samurai are typically not accredited test drivers either. Moreover, it's undisputed that the actual short course test runs, in which the Samurai tipped several times and the other vehicles didn't tip once, were all performed by CU test drivers.

biased against his target is fully protected; the First Amendment extends beyond "reasoned [and] evenhanded" commentary to the "slashing and one-sided." *Hustler Magazine v. Falwell*, 485 U.S. 46, 54, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

Bias may *support* a showing of actual malice; if you bad-mouth someone, the fact that you also don't like him makes it marginally more likely you're lying. But bias evidence is not sufficient by itself to support a claim: "[A]ctual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (internal quotation marks omitted); *see also, e.g., Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir.2001); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir.1995). If a tabloid sends an investigator to dig up dirt on a celebrity, the fact that it deliberately attempts to find damaging information and is pleased when it succeeds hardly proves it's lying. Forcing CU to stand trial for statements that show nothing more than bias ignores these settled First Amendment principles.

We don't hold participants in public debate to Article III standards of impartiality. Nor do we second-guess their investigations as if we were reviewing administrative action under the APA. So long as they don't lie or recklessly disregard the truth, they can be as unfair and one-sided as they want. The majority's clear and convincing evidence that CU strayed beyond this wide field is shockingly thin. The Second Circuit requires a plaintiff to show that bias was coupled with "an *extreme* departure from *standard* investigative techniques." *Behar*, 238 F.3d at 174 (emphasis added). For the majority, *any* departure from *past* technique will apparently suffice, even

one entirely consistent with standard experimental methodology.

What ultimately dooms Suzuki's case is that, no matter *what* CU's motives for choosing the short course, it is undisputed that the Samurai tipped multiple times on that course while the other vehicles tested didn't tip even once. If the majority has its way, evidence like this—which may make a life-or-death difference to consumers—will be suppressed for fear of precisely this type of lawsuit, waged with gale-force intensity by corporate plaintiffs with bottomless litigation budgets.

3. The majority's second ground for reversal is weaker still. After CU published its initial report, NHTSA criticized certain aspects of its methodology. CU responded, and the majority finds its response for the most part satisfactory. It concludes, though, that CU fell short by failing to address NHTSA's critique of its reliance on driver input.

The majority's analysis suffers from familiar flaws. Even if CU's reliance on human drivers made its tests less reliable, it *disclosed* the relevant facts in its report. CU explained in detail its use of human test drivers and the precise maneuvers they performed—right down to the distance between traffic cones. *See* pp. 1115–1116 *supra*. Surely these disclosures provide adequate information for readers to make a reasonable assessment of CU's testing. At the very least, they provide readers familiar with safety testing mechanics—such as NHTSA and Suzuki engineers—the information they need to assess CU's testing and come up with a public response. CU should not stand trial over a potential source of experimental error that it fully disclosed.

The majority's holding is flawed for deeper reasons as well. It faults CU for failing to "investigate" and "address" a perceived deficiency in its testing proce-

dure. Am. op. at 1139. But what was CU supposed to do? Using human drivers obviously introduces a potential source of experimental error. But it also replicates actual driving conditions and thus captures nuances that might be missed if the experiment were performed by entirely mechanical means. If CU had built some stationary rollover machine instead, Suzuki would have complained that its failure to recreate actual driving conditions made its results unreliable. If CU had built a car-driving robot, Suzuki would have complained that the test didn't reflect the reactions of a *human* driver. All experiments have potential sources of error, and many reputable experiments rely on human input. That an experiment can be criticized on these grounds doesn't make it reckless to rely on the results, even if the criticisms have some validity. Failure to explain away or eliminate all potential sources of error in an experiment cannot be a basis for liability.

What the majority calls "actual malice" is really just one side of a long-running debate over how to test rollover propensity most effectively. CU favors "dynamic" tests using actual drivers, while NHTSA has long preferred "static" tests based on measurements of a vehicle's geometry. While the majority thinks NHTSA has the better of this scientific debate, Congress was not so sure: In 2000, it passed a statute *requiring* NHTSA to develop a dynamic rollover testing program. Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act, Pub.L. No. 106–414, § 12, 114 Stat. 1800, 1806 (2000) (codified at 49 U.S.C. § 30117(c)); *see* Consumer Information Regulations; Federal Motor Vehicle Safety Standards; Rollover Resistance, 66 Fed.Reg. 35,179, 35,180–81 (request for comments July 3, 2001) (explaining the statute's history). The TREAD Act followed on the heels of CU's criticism that NHTSA's static testing methods, although

a "useful predictor of tripped rollover, . . . should be used in conjunction with a dynamic stability test using vehicle maneuvers to better predict the risk of untripped rollovers." 66 Fed.Reg. at 35,180–81. And as NHTSA concedes, the Act "reflects CU's concern." *Id.* at 35,181.

As if that weren't vindication enough, when NHTSA acted on Congress's directive, one of the dynamic rollover tests it initially proposed using was the "CU double lane change," *id.* at 35,183, the very test the majority now finds so heretical that reliance on it amounts to actual malice. NHTSA identified both the advantages of CU's test ("face validity"; "probably a good representation of what the public expects of a personal vehicle"; "better represents the dynamics that may result in an untripped rollover"; "maximum speed through the maneuver can be used as part of the vehicle score"; "display[s] the operation of electronic stability control systems") and its disadvantages ("any vehicle will pass such a test if equipped with tires of sufficiently low traction"; "driving style can strongly influence the test results"; "course layout may cause the steering reversal and roll momentum effect to be more critical for some vehicles than for others"; "a course tuned to one vehicle may not be the worst case for another vehicle to which it is compared"). Although NHTSA ultimately opted for a different set of dynamic rollover tests, those it selected still relied on human drivers and merely involved a lower number of steering inputs (one or two, as opposed to four in CU's test). *See* Consumer Information Regulations; Federal Motor Vehicle Safety Standards; Rollover Resistance (Part II), 67 Fed.Reg. 62,528, 62,537–38 (proposed Oct. 7, 2002). NHTSA thus reduced, but did not eliminate, this potential source of error.

Surely these legislative and regulatory developments bear heavily on the disputed issues in the case. Strangely, however, the majority does not even mention them. That Congress specifically repudiated NHTSA's exclusive preference for static rollover testing shows we cannot blindly accept NHTSA's criticism of dynamic testing as evidence of actual malice. That NHTSA thought CU's test was an option worth considering twelve years later shows that it is not so off-the-scientific-map that reliance on it is tantamount to purposeful avoidance of the truth. That NHTSA ultimately chose tests that involve the same source of error, just to a lesser degree, shows that the issue is not nearly so black-and-white as the majority paints it. On a more fundamental level, these developments show that courts have no business wading into this scientific feud over the best way to test rollover propensity. Which method gives the optimal mix of advantages and disadvantages is a point of disagreement among Congress, NHTSA, CU and others. It should be resolved by scientists, policymakers and consumers, not crushing libel verdicts.

The appropriate response to a poorly designed experiment is to conduct a better one and then convince people that your method is more accurate—not to sue the other guy into silence. The point is poignantly made by the facts of this case. For all its kvetching, NHTSA apparently never even performed its own tests on the Samurai—it relied entirely on data from Suzuki. *See* Am. op. at 1138. Suzuki's test procedures no doubt had plenty of defects of their own (the most obvious being "company conducting test has financial stake in outcome"). Can we really say the world is better off if the only source of Samurai rollover data is the manufacturer? If consumers are purchasing an SUV they will trust with their lives, aren't they entitled to know that the Samurai tipped re-

peatedly in human-driven tests while the other SUVs didn't tip once?

Groups like CU perform a valuable function in our consumer society, but they suffer from a constant threat of litigation. It's easy for a jury to second-guess experimental design, and every suit carries the prospect of a massive damages award because the very purpose of a negative review is to convince the reader that the plaintiff's product is not worth buying. It's hardly surprising, then, that CU attracts lawsuits like moths to a lantern. *See, e.g., Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (truly silly dispute over whether sound from plaintiff's speakers wandered "about the room" rather than merely "along the wall" litigated all the way to the Supreme Court). If Suzuki can get to trial on evidence this flimsy, no consumer group in the country will be safe from assault by hordes of handsomely paid lawyers deploying scorched-earth litigation tactics.

The majority's decision reaches far beyond consumer organizations to virtually any research group that criticizes corporate interests. Many public interest groups are thinly funded, and their experiments are necessarily full of imperfections. Their targets can now stuff unflattering results into a scientific oubliette just by pointing out sources of experimental error and then threatening to sue if the groups don't "investigate" and "address" them. Today it's Consumers Union panning the Samurai; tomorrow it could be Greenpeace claiming that some oil refinery is killing fish. The First Amendment doesn't allow companies to squelch their scientific detractors on evidence as thin as Suzuki's. The majority's legal regime cannot coexist with our tradition of robust scientific debate on matters of public concern.

4. Judge Graber focuses on two particular statements, but succeeds only in high-

lighting how deficient Suzuki's case is. She first faults CU for reporting that it developed the short course "because [it] discovered" the Samurai's rollover propensity, when in fact it developed it "in order to create" that propensity. Concurrence at 1141 (emphasis omitted).

I don't understand how CU could have "create[d]" the Samurai's rollover propensity. A propensity is something innate to the object. Is Judge Graber suggesting that CU somehow modified the vehicle to make it more likely to tip? There is no evidence of that whatsoever. What CU did was put the Samurai through a test that *demonstrated* its innate tendency to tip, a propensity it had as a result of the way it was built. CU designed a course to develop evidence of the vehicle's propensity to roll over. It could not and did not create the propensity itself.

That problem aside, there is simply nothing false about CU's statement. There's no dispute *why* CU built the short course: As it thoroughly explained in its article, it was trying to replicate the conditions that caused the Samurai to tip when a CU employee turned too sharply on the long course. Suzuki doesn't dispute this. CU switched to the short course "because [it] discovered" a propensity to roll over during that particular maneuver, a maneuver none of the drivers had previously performed because they had all driven the long course as designed. CU's statement is an entirely accurate description of its reason for developing the short course.[8]

Judge Graber also complains that CU said the Samurai rolls over "easily" when,

in fact, it had to be "coaxed." Concurrence at 1141. She apparently fears that readers might assume the Samurai rolled over with no "coaxing" at all. But no one could be so misled. Even tremendously unsafe vehicles roll over only in extreme maneuvers. No one reading that the Samurai rolls over "easily" would infer it routinely flops over with no human intervention.

Saying a consumer vehicle rolls over "easily" is like saying a particular NBA player is "terrible." The adjective is inherently relative because the reference group is already extreme. A "terrible" professional athlete is one who's terrible relative to his peers, not relative to the population at large or a class of third-graders. Likewise, the mental image conjured up when one hears the Samurai rolls over "easily" is not of some oopsy-daisy clown car, but a vehicle that rolls over easily *relative to other vehicles in its class.* And, since all vehicles require *some* coaxing to roll over, Judge Graber's fear—that readers might be duped into thinking they'll come out of the supermarket to find that their Samurai had flopped itself over in the middle of the parking lot—is a specter of her own creation. Even ignoring the rollover during break-in and the tip on the long course—not to mention the NHTSA complaint and the media coverage—CU was plainly justified in concluding that, given the alternatives, the Samurai's rollover propensity was more than what safety-conscious consumers should be willing to bear. And that's exactly what any reader would understand it to have said.

---

**8.** Even if Judge Graber were right and CU somehow misled the public about its reasons for building the short course, I can't see how it could possibly matter. Whether CU built the short course for the reasons it gave or because little green men from Mars told it to do so, the fact remains that it built the course and the Samurai flunked it while every other vehicle passed. CU's motives simply are not germane to Suzuki's theory of recovery because they do not in any way defame the Samurai or contribute to any damage it may have suffered. It's as if CU claimed it conducted the tests on a Wednesday when it actually conducted them on a Friday.

Moreover, the word "easily" cannot be plucked out of context. It must be read in light of CU's article (to which the anniversary issue obviously referred). CU explained exactly how "easily" the Samurai tipped over, and what CU did to reach its conclusion. It did not secretly put lead weights in the roof to raise the center of gravity; it did not use narrow tires to cause instability; it did not jimmy the suspension. It did exactly what it said it did—it put the Samurai through the same course as the other vehicles, and the Samurai tipped while the others did not. CU did not ask consumers to accept its claim at face value; it gave them the data on which it based its conclusion so they could decide for themselves whether or not the Samurai tipped over too easily.

Even if CU's reporting were somehow inaccurate or misleading, there are any number of legal doctrines that protect it. ("Rhetorical hyperbole" comes to mind, *see Letter Carriers*, 418 U.S. at 285–86, 94 S.Ct. 2770.) But it's not. CU had adequate grounds to conclude that the Samurai rolled over easily compared to similar vehicles, and that's all it said.

Judge Graber doubtless perused the record with great care in search of something to support Suzuki's case. That she could come up with nothing better than these two statements speaks volumes about the overall accuracy and candor of CU's reporting.

\* \* \*

I have read CU's review of the Samurai and Suzuki's criticism of its methodology. After all that, I can only say I would long hesitate before letting anyone I care about drive or ride in one of these vehicles. If Suzuki wanted me to disregard CU's conclusions, it should have taken the money it spent on this lawsuit and hired an independent agency to run tests showing that CU's criticisms are unfounded. It could also have tried to improve its product to moot criticism in the future. But, until today, I had thought the one option not available to a company in Suzuki's position was to use its vast financial resources to drag its critics through the gauntlet of our immensely expensive litigation machine. I continue to hope I'm right, or this will be a sad day indeed for consumer organizations and those who rely on them for information vital to their health and safety.

## APPENDIX

# WARNING

# The Suzuki rolls over too easily

### The Jeep Wrangler, the Jeep Cherokee, and the Isuzu Trooper got through our emergency turns. The Suzuki Samurai flunked.

*"No auto since the VW beetle has created such a sensation. Large real-estate developers, career women, surf bums and college students are having a ball in today's cult car, the Suzuki Samurai. They're painting them pink and dressing them up with chrome wheels, fog lamps and spare tire covers. And they're cruising everywhere with the top down in their four-wheel-drive baby jeeps...."*

—*Marketing & Media Decisions*

Early this year a staff member was driving our new *Suzuki Samurai* slowly, in second gear, along a snow-covered dirt road leading to our auto test track when he felt the tires grab in a rut worn by earlier traffic. The driver turned the wheel to the right to steer clear. The front wheels pulled out of the rut and climbed approximately six inches up a ridge of plowed snow at the side of the road. Then, as the driver tried to straighten the wheels, the *Suzuki* flopped over on its side.

The driver climbed out uninjured, but with new respect for the laws of physics

The laws of physics say a vehicle with a high center of gravity is more likely to roll over than a vehicle with a low center of gravity. All four-wheel-drive utility vehicles have a higher center of gravity than passenger cars, a consequence of the extra ground clearance needed when driving on rough terrain rather than a paved road.

The laws of physics say a *narrow* vehicle with a high center of gravity is more likely to roll over than a *wider* vehicle with a high center of gravity. The *Suzuki Samurai* is one of the narrowest vehicles on the road. Its "tread" width—the distance from the center of the left front wheel to the center of the right front wheel—measures only 51.2 inches.

A *short* narrow vehicle with a high center of gravity is more likely to roll over than a longer narrow vehicle with a high center

of gravity. The *Suzuki Samurai* is also one of the shortest vehicles on the road, only 80 inches between the centers of the front and rear wheels.

Finally, a light vehicle is more likely to tip over than a heavy vehicle, other things being equal. The *Suzuki* weighs 950 pounds less than the *Jeep Wrangler*, the small utility vehicle that's closest to it in general configuration. It weighs 1220 pounds less than the *Jeep Cherokee* and 1590 pounds less than the *Isuzu Trooper II*, the two larger utility vehicles tested for this report.

Given their physical characteristics, it's not surprising that utility vehicles roll over two to three times more frequently than do passenger cars. Nor is it surprising that the fatality rate among occupants of *small* utility vehicles is more than double that of small passenger cars and small pickup trucks, the second most hazardous types of vehicle.

When the Insurance Institute for Highway Safety analyzed auto accident fatalities in one- to three-year-old cars and trucks for the years 1981 to 1985, it found that occupants of small utility vehicles were being killed at the rate of 5.7 for every 10,000 vehicles registered. For small passenger cars and small pickups, the rate was about 2.4 deaths per 10,000, for large cars, about 1.2 deaths per 10,000

The *Suzuki Samurai* was not marketed in the U.S. during the years those accident fatalities were occurring. However, it is rapidly compiling mortality statistics all its own.

The Center for Auto Safety, a nonprofit consumer group, says it has received reports of 20 *Suzuki Samurai* rollover accidents resulting in 21 injuries and four deaths. It has also received reports of six rollovers in variants of the *Samurai*, such as the *Suzuki SJ410*, which is sold in Hawaii and the Virgin Islands; those resulted in seven injuries and one death. The National Highway Traffic Safety Administration has received 44 reports of *Samurai* rollovers, resulting in 16 deaths.

That's an ominous record of rollovers, considering that there are only 150,000 *Samurais* on U.S. roads so far, and that many of them have been in use for less than a year.

The physical characteristics of four-wheel-drive utility vehicles, the accident statistics, and our own experience were very

much on the minds of our auto testers as they prepared to run the *Suzuki Samurai*, the *Jeep Wrangler*, the *Isuzu Trooper II*, and the *Jeep Cherokee* through their paces.

Our regular test program includes a maneuver designed to see how controllable a car remains when a driver is forced to steer sharply—to avoid, say, a child who unexpectedly darted into the road. To simulate that kind of sudden emergency, our drivers run each car through a lane-changing course marked off by traffic cones. One cone blocks the right-hand lane, a stand-in for the obstacle to be avoided. The drivers begin their left turn out of the lane 60 feet before the obstacle. They then must steer sharply enough to get back into the lane no more than 60 feet beyond the obstacle.

Our test drivers take the cars through the course at increasingly higher speeds, noting how fast they can swerve around the obstacle without knocking over cones and without losing control.

The cars get the benefit of the doubt in this test. We run the test on dry pavement with expert drivers who've steered through the course hundreds of times before. The drivers don't brake while steering, as a nonprofessional driver might in an emergency, so the cars aren't forced into premature skids or spins. Nor do they accelerate. This "accident-avoidance maneuver" realistically simulates a situation that could confront any driver any day. We never attempt unrealistic stunts, such as U-turns at high speeds.

Most vehicles weave through the course easily up to about 50 mph, then start hitting cones or skidding at some point above 50 mph. During the 10 years we've used this test, no vehicle we've tested—and these have included many vans and small trucks with high centers of gravity—has threatened to roll over.

Under the experienced touch of our drivers, all four utility vehicles got through the course at 52 mph or better. The *Suzuki Samurai* was actually more maneuverable than the others, since it's so much smaller and lighter.

With concern about a potential rollover somewhat allayed, a staff member who does not normally drive the course tried to steer the *Suzuki* around the obstacle. All went well for several runs at moderate speed. Then, on a run at 45 mph, the driver made a slight steering misjudgment: He turned wider than necessary to clear the obstacle, something many ordinary drivers might do in an emergency turn. That forced him to turn back a bit more sharply than our regular testers had. As he turned the steering wheel to the right to get back into lane, the *Suzuki* teetered to the left. The two right-side tires lifted about a foot off the pavement before the driver was able to bring the vehicle back under control.

The *Suzuki* had come within a hair of rolling over at a moderate speed in a maneuver that shouldn't put daylight under the tires of any car. A poor-handling car might skid or spin when turned sharply at these speeds. That's hazardous enough. But a rollover at moderate or high speed would very likely injure or kill the occupants. A rollover in an open vehicle, such as the *Suzuki* featured in the company's "fun" commercials aimed at young people, is especially deadly.

Would the other utility vehicles show similar instability if steered the way the *Suzuki* had been steered?

To find out, we put all the vehicles through a slightly different maneuver. We realigned the cones so that our test drivers had to start the turn 50 feet from the obstacle instead of 60 feet from it. That meant they needed to steer around the obstacle and back into lane in a total of 110 feet rather than the usual 120 feet. We also moved the obstacle three feet farther to the left.

As a result of those changes, our drivers would have to sharpen their turns a little.

For this test, we equipped the two small vehicles, the *Suzuki Samurai* and the *Jeep Wrangler*, with the outriggers shown in the photos at the left. If one of them tipped during the test, the outriggers would contact the road first and keep the vehicle from landing on its side. (The outriggers also added about 300 pounds, making the *Suzuki* and the *Jeep Wrangler* somewhat harder to roll than they normally would be.)

In this more demanding test, the *Isuzu Trooper*, the *Jeep Wrangler*, and the *Jeep Cherokee* began knocking over cones at about 40 mph. But they remained stable. We also tried the *Jeep Wrangler* without the outriggers. Still stable.

The *Suzuki Samurai*, by contrast, toppled onto the outriggers when turned through the course at about 40 mph. Without the outriggers, it would have rolled over.

During the period we were testing these vehicles, Suzuki introduced a modified version of the *Samurai*, a "1988½" model with a softened suspension. We acquired the latest version and ran it through the same accident-avoidance maneuver. It proved even less stable than the *Samurai* we originally tested. The front right wheel lifted in turns at low speed. And the vehicle rolled onto the outriggers at 38 mph.

In our judgment, the *Suzuki Samurai* is so likely to roll over during a maneuver that could be demanded of any car at any time that it is unfit for its intended use. We therefore judge it Not Acceptable.

A rollover in a *Suzuki Samurai* would be even more dangerous than a rollover in a passenger car. Utility vehicles such as the *Suzuki* are not required to meet Federal safety standards for side-impact and rollover protection, which cover only passenger cars. Although widely advertised, sold, and used as a passenger car—indeed, as a car in which "to have a ball," as the advertising trade press puts it—the *Suzuki* we tested has no rollbar to reinforce its hardtop, as the *Jeep Wrangler* does.

Soon after our tests were complete, we called the results to the attention of the National Highway Traffic Safety Administration, in an effort to warn those who might have been considering a *Suzuki* before this issue of CONSUMER REPORTS came out. We have also petitioned NHTSA to establish minimum stability standards for all vehicles, so that cars and trucks as tippy as the *Suzuki Samurai* can no longer be sold here.

Unfortunately, NHTSA, a reluctant watchdog, has already denied a similar petition filed last year by Sen. Timothy Wirth (D., Colo.). Senator Wirth based his petition on the fatality record of past vehicles whose physical characteristics indicated potential instability; we base ours on test results.

Senator Wirth also asked for a defect investigation and possible recall of vehicles with a potential to roll. In April, NHTSA denied that petition as well, saying such an investigation would be costly and time-consuming. Instead, it plans to issue a pamphlet on the safe use of utility vehicles.

But if reading material is the answer, Suzuki and other manufacturers already provide it. The cars all carry warning stickers

mandated by law. Suzuki's sticker, attached to the inside of the driver's door, reads as follows:

> Warning: "This is a multi-purpose vehicle which will handle and maneuver differently from an ordinary passenger car, in driving conditions which may occur on streets and highways and off-road. As with other vehicles of this type, if you make sharp turns or abrupt maneuvers, the vehicle may rollover or may go out of control and crash. You should read driving guidelines and instructions in the owner's manual, and WEAR YOUR SEATBELTS AT ALL TIMES."

Such stickers may help Suzuki defend against the liability suits that are already coming its way. But the Government agency responsible for auto safety should not be content with stickers or with some pamphlet as a substitute for safe design. It's doubtful that those youngsters shown tooling down to the local soda fountain in one of Suzuki's commercials will take the time to read a label or a pamphlet when they confront their first sudden turn.

The Center for Auto Safety has filed a more specific petition, asking for a defect investigation and recall of all Suzuki Samurais. We support that petition. Unfortunately, the Samurai is not hazardous as a result of a defect that can be fixed. The design itself is hazardous, combining a high center of gravity with a narrow tread width, a short wheel base, and light weight. A true consumer-protection agency would require Suzuki to buy its product back from the consumers it has put at risk.

Unlike the Suzuki, the other three utility vehicles purchased for this report are not unreasonably hazardous. The bigger ones, the Jeep Cherokee and the Isuzu Trooper II, are the equivalent of mid-sized passenger cars. We equipped them the way the typical buyer would, with automatic transmission, power steering, air-conditioning, and other common options. We chose the optional six-cylinder engine for the Cherokee, since the vast majority of them are sold that way. A Six isn't available for the 1988 Trooper II; a larger fuel-injected Four is new to the Trooper this year, as is an automatic transmission. So equipped, the Cherokee's list price topped $18,000; the Trooper II reached nearly $16,000.

The Jeep Wrangler, like the Suzuki, is a runabout that appeals to a younger, more adventuresome buyer. To keep the price down, we chose a basic model with few options. Our Wrangler had the standard four-cylinder engine and five-speed manual transmission. We opted for the hard top with full doors rather than the convertible. But even modestly outfitted, it listed for over $12,000. A comparably equipped Samurai lists for about $10,000.

Part-time four-wheel drive (you can shift in and out of the four-wheel-drive mode) is standard in all these vehicles. Four-wheel drive is intended for use in snow, ice, or mud, or when driving off road. All the vehicles have an additional Low range in four-wheel drive, so they can be driven slowly over demanding terrain and yet retain sufficient power to climb steep grades.

As we've noted above, "sport/utility" vehicles such as these need not conform to a number of important safety regulations that apply to passenger cars. They are exempt not only from regulations that specify the crush-resistance of the roof and resistance to side impacts but from those that require head restraints for front-seat occupants, eye-level brake lights, and automatic safety-belt systems. Nor need they conform to any standards for bumper protection. We did not perform our bumper tests with these vehicles. Because their bumpers are higher than those on passenger cars, our bumper basher would pass under them, just as a passenger car's bumper would. Our examination indicated, however, that the bumpers and the vehicles' adjacent body structure would probably be damaged severely in a 5-mph collision.

## Recommendations

The *Jeep Cherokee* and the *Isuzu Trooper II* are designed to function as family-sized passenger cars as well as go-anywhere four-wheel-drive vehicles. Of the two, the *Cherokee* feels a bit more like an ordinary station wagon. Its four-wheel-drive system works simply and easily. It is, however, more expensive than the *Trooper* and, according to owners surveyed, likely to be more troublesome.

The *Trooper* is larger, taller, and more trucklike in feel, and it can carry more than the *Cherokee*. If you must have an automatic transmission, prepare to deal with the inconvenience of manually locking the *Trooper's* front wheel hubs whenever you want to shift into four-wheel drive. We think that's a great disadvantage, but avoidable if you purchase a *Trooper* with a manual transmission.

Other competing vehicles in this class include the *Chevrolet S-10 Blazer* and the *Ford Bronco II* (last tested in 1984). Neither is available in a four-door version, a serious omission in this family-wagon class. And neither offers the passenger accommodations or cargo volume of the *Trooper*, or is likely to be as reliable.

The *Jeep Wrangler* is in another class entirely. It doesn't pretend to be a comfortable people-mover or a capable cargo-carrier. In the basic model we tested, it's a crude vehicle, very noisy and hard-riding. But it does what it is supposed to do as a simple on-and-off-road utility vehicle. Its handling is well below that of the average passenger car. We believe it could be a handful for the average driver, particularly in emergency maneuvers. The *Wrangler's* repair record is likely to be worse than average.

The *Suzuki Samurai*, of course, is all the craze in small jeeplike vehicles. In our opinion, its behavior in emergency maneuvers, detailed on pages 424 to 426, is all a rational buyer needs to know about this car. But we found it wretched in most other respects as well. ∎

## OPINION

TASHIMA, Circuit Judge.

In 1988, Appellee Consumers Union of United States, Inc. (CU), published a story in its magazine *Consumer Reports,* in which it rated the Suzuki Samurai "Not Acceptable" based on its propensity to roll over during accident avoidance tests. Since that time, CU has publicly referred to the negative Samurai rating in various fora, most prominently in the 60th Anniversary issue of *Consumer Reports,* published in 1996. Appellant Suzuki Motor Corporation (Suzuki), the manufacturer of the Samurai, has challenged the validity of CU's Samurai test and, on the heels of the 60th Anniversary issue, brought this action against CU alleging product disparagement. CU's motion for summary judgment was granted by the district court, which held that a reasonable jury could not conclude by clear and convincing evidence that CU had acted with actual malice. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## I. BACKGROUND

CU is a nonprofit corporation that engages in comparative testing and evaluation of consumer products and services, the results of which are published in the magazine *Consumer Reports.* In order to provide buying and safety advice to automobile purchasers, CU's Automotive Testing Division (ATD) tests approximately 40 cars and other vehicles each year.

CU tested the Samurai in 1988.[1] The Samurai, a sport utility vehicle (SUV) manufactured by Suzuki, was introduced in the United States in 1985. By 1988, approximately 150,000 Samurais had been sold. Although it had received some favorable reviews from the automotive press, the Samurai had also been the subject of news stories that highlighted its instability and propensity to tip over. In February 1988, the Center for Auto Safety filed a petition with the National Highway Traffic Safety Administration (NHTSA) to open an investigation into an alleged safety defect of the Samurai. The petition was denied, although the NHTSA emphasized that the denial was not an endorsement of the safety performance of a vehicle.

### A. April 20, 1988: Long Course Testing

On April 20, 1988, the ATD tested the Samurai, along with the Jeep Cherokee, Isuzu Trooper II, and Jeep Wrangler, on its standard long course, a double lane-change avoidance maneuver test course that CU had used since 1973.[2] The long course was designed to replicate an emergency situation in which a driver suddenly steers a vehicle left into the opposing lane, to avoid an obstacle, and quickly back into the original lane to avoid oncoming traffic. Several CU personnel were in attendance during the April 20 testing, including Rob-

---

1. As Suzuki points out, around this time CU made a significant financial outlay in order to secure a new headquarters building in Yonkers, New York. This outlay of approximately $30 million placed CU in what the district court termed a "financially overextended" position.

2. The long-course maneuvers followed preliminary testing on the Samurai. CU notes that during the evaluation and break-in process, Alan Hanks, the Facilities Manager of

the ATD, rolled the Samurai on a snow-covered gravel road at 15 miles per hour. During the formal test ride on April 7, 1988, CU driver Kevin Sheehan reported that the Samurai was "by far the worst ride in my 20+ years at CU." Sheehan also took the Samurai on a one-day trip test on April 11, 1988, after which he noted that the Samurai should be rated "Not Acceptable." In addition, as Suzuki notes, preliminary research had been conducted for the Samurai story prior to the initiation of long-course testing.

ert Knoll, the head of the ATD, Dr. R. David Pittle, CU's Technical Director and Senior Vice–President, and Irwin Landau, the Editorial Director of *Consumer Reports,* who had been assigned as the initial writer and editor of the Samurai article. Pittle had invited Landau to attend the testing because he thought that they might witness a tip-up of the Samurai.

CU driver Kevin Sheehan drove the Samurai first, putting it through the long course 16 times at speeds reaching over 50 miles per hour. The Samurai that Sheehan drove was equipped with outriggers, which essentially act as training wheels to prevent the car from tipping over completely.[3] During Sheehan's runs, the Samurai did not tip over, prompting Sheehan to make the following evaluation of the car: "rubbery, slow response, rocks a bit, but never felt like it would tip over." In the Avoidance Maneuver Data Summary, Sheehan rated the Samurai as highly as or better than other vehicles tested that day.

After Sheehan had completed his testing, CU removed the outriggers. CU driver Rick Small then drove the Samurai through the long course 21 times at speeds similar to those achieved by Sheehan. Again, there were no tip-ups. In his driver log, Small stated: "steering is slow, but it works—responds well and corrects quickly, leans normally, snaps back. Confidence fairly high. No real problem." On the basis of his test drives, Small rated the Samurai higher than the other three vehicles tested that day.

According to testimony by former CU employee Ron Denison, at some point during the long-course testing, which had not demonstrated any tip-ups of the Samurai, Landau told Sheehan: "If you can't find someone to roll this car, I will."

After Sheehan and Small had completed their test runs, Pittle, who was not a test driver, began to drive the Samurai through the long course. According to Pittle, he did so because he had never driven a small SUV and wanted to get a feel for how it handled through the course. Pittle took the car though the course 10 times, achieving a top speed of 49 miles per hour. On Pittle's tenth run, the Samurai tipped up on two wheels. Pittle stated that he did not purposefully cause the Samurai to tip up and that it was a startling and unexpected occurrence. When Pittle tipped the car, one onlooker yelled, "yeah!," while another shouted, "I think I got that, I think I got that."

## B. April 26, 1988: Short–Course Testing

After the long-course testing, Knoll redesigned CU's avoidance course to replicate the situation that caused the Pittle tip-up. This new modified short course had a reduced distance for the first lane change, and the obstacle to be avoided was moved three feet to the left.

Sheehan, who was afraid to drive the Samurai through the short course, was replaced by CU driver Fred Wood. Wood, who drove the vehicle with outriggers, made 15 runs through the course. On the fifteenth run, the Samurai tipped up onto the outriggers. After this last run, Knoll is heard on the test videotape saying: "That's it. That looked pretty good." Knoll later acknowledged that he was "relieved" that the Samurai tipped up during short-course testing.

Small then drove the car through the short course. On his second run, the Samurai tipped up onto the outriggers at a speed of 40 miles per hour. After the tip-

---

**3.** Suzuki contends that the outriggers allowed CU to achieve dramatic results during the

tests without risking a real rollover.

up occurred, CU technician Joseph Nappi can be heard on the test videotape saying, "[a]ll right Ricky baby."[4] That same day, CU also put the Jeep Wrangler and Isuzu Trooper II through the short course with no tip-ups reported.

### C. May 12, 1988: Additional Short–Course Testing

Further testing was scheduled on the short course for May 12, 1988. The parties offer conflicting justifications for why this set of tests was necessary. Suzuki suggests that the additional testing was scheduled for the purpose of shooting video footage of the Samurai for a subsequent press conference, at which it had already been decided that CU would rate the Samurai "Not Acceptable." CU contends that the testing was held to evaluate the performance of the newly released 1988 Samurai, which included suspension modifications that distinguished it from the 1988 version tested previously.

Small was the first to drive the Samurai through the short course on this day, tipping over onto the outriggers on his fifth run. Following Small, Wood tipped the Samurai on his second run. Pittle was watching the test runs and, prior to witnessing a tip up, stated: "Can't you just see it, we get no lift off the ground. Oh God." CU also put a Jeep Wrangler, Jeep Cherokee, and Ford Festiva sedan through the short course on May 12. None of these vehicles tipped up.

### D. June 2, 1988: Press Conference

CU held a press conference on June 2, 1988, at which it announced that the Samurai had shown a propensity to roll over in CU's tests and that it would be rated "Not Acceptable" in an article to appear in the July 1988 issue of *Consumer Reports*. During the press conference, Pittle stated that, based on CU's testing, the Samurai had an "unusually high propensity to roll over while performing an accident avoidance maneuver that could be demanded suddenly of any driver during routine driving." Pittle further described the short course as "benign," involving only "very limited steering inputs," a characterization he later conceded was "not accurate." Pittle also stated that the other tested vehicles had made it through the short course with a "yawn," a statement that Suzuki contends is at odds with the fact that the Isuzu Trooper II failed the course in three out of four runs by hitting cones.[5]

### E. July 1988: Article Publication

CU's negative rating of the Samurai was detailed in an article entitled, "Warning: The Suzuki rolls over too easily," published in the July 1988 issue of *Consumer Reports*. The article was initially written by Landau, although drafts were reviewed by Pittle, Knoll, the ATD staff, CU's President Rhoda Karpatkin, CU's Technical Department and Library, and legal counsel.

---

**4.** Suzuki emphasizes CU's submission of what it characterizes as a "false" affidavit in connection with Nappi's statement. CU employees Hanks, Sheehan, Wood, Nappi, and Knoll submitted an affidavit stating that it was Denison, not Nappi, who could be heard on the videotape saying "All right, Ricky baby" after Small tipped the Samurai on April 26, 1988. Nappi later admitted, however, that he in fact made the statement. Suzuki suggests that the affidavit was submitted in an effort to discredit Denison, who had testified that Landau threatened to find someone to roll the Samu-

rai after the April 20, 1988, long-course testing. CU proffers a benign explanation for Nappi's changing his story. Resolution of this dispute, however, is not critical to our decision.

**5.** Suzuki also argues that CU deliberately excised footage of the Isuzu Trooper II's runs from the videotape screened at the press conference to downplay the fact that the Trooper also had trouble making it through the course.

The article described the steps CU took to test the Samurai, Jeep Wrangler, Isuzu Trooper II, and Jeep Cherokee. It began by recounting the incident in which an ATD staff member rolled the Samurai over on its side during the evaluation and break-in process. After detailing other evidence of the Samurai's safety problems, the article then described the long-course testing, noting that Pittle, "a staff member who does not normally drive the course," tipped the Samurai at 45 miles per hour after making "a slight steering misjudgment" that should not have "put daylight under the tires of any car." The article continued by highlighting the results of both short-course tests, concluding that "that *Suzuki Samurai* is so likely to roll over during a maneuver that could be demanded of any car at any time that it is unfit for its intended use. We therefore judge it Not Acceptable."

On June 2, 1988, CU submitted to NHTSA a copy of the article, the videotape from the press conference, and a diagram of its short course in support of a petition to establish a minimum stability standard to protect against unreasonable risk of rollover.

### F. NHTSA Report

On September 8, 1988, NHTSA issued a decision denying the motor vehicle defect petition filed earlier by the Center for Auto Safety. In its analysis, the NHTSA stated that "the rollover crash involvement of the Samurai appears to be within the range of most other light utility vehicles." [6] Denial of Motor Vehicle Defect Petitions, 53 Fed.Reg. 34,866 (Sept. 8, 1988). It concluded that the Ford Bronco II "was found to have more than 3 times the first event rollover ... involvement as the Samurai" and that "the Samurai had a first event rollover involvement corresponding to the [Chevrolet] S-10 Blazer." *Id.*

NHTSA's opinion also criticized CU's testing protocols, stating as follows: "The existing test procedures for assessing the rollover propensity of vehicles are unsatisfactory because they do not provide for repeatable, reproducible results, and there are no accepted performance criteria. The testing appears to rely on the skill and influence of the driver and the presumption that the vehicle suspension, tire, and road surface characteristics will remain constant throughout the testing." *Id.* at 34,867. NHTSA concluded by stating that, although the CU testing results were "cause for some concern," "the test procedures do not have a scientific basis and cannot be linked to real-world crash avoidance needs, or actual crash data. Using the same procedures, probably any light utility vehicle could be made to roll over under the right conditions and driver input." [7] *Id.* CU issued a subsequent article in *Consumer Reports* criticizing the NHTSA decision.

### G. 1988–1996: CU's Republications of the Samurai Report and Further Rollover Claims

Between 1988 and 1996, CU republished references to the 1988 Samurai rating on at least 24 separate occasions in *Consumer Reports,* CU's annual buying guide, and other editions of CU's car books. During this time, CU states, several events bolstered its belief in the correctness of its

---

**6.** On September 25, 1996, NHTSA denied a second Samurai defect petition on similar grounds. Denial of Motor Vehicle Defect Petition, 61 Fed.Reg. 50,372 (Sept. 25, 1996).

**7.** In its summary of the test results on multipurpose vehicles, Britain's Department of Transport similarly concluded that the "results from the modified Consumer Union tests were unpredictable" and that "[d]river influence is greatest in the modified Consumer Union manoeuvre." Dep't of Transp., Stability of Multi-Purpose 4-Wheel Drive Vehicles (Dec. 16, 1988).

"Not Acceptable" rating: a 1988 England-based Consumers' Association article that buttressed the Samurai rollover claim; a 1988 lawsuit filed by seven state Attorneys General charging Suzuki with false and misleading advertising regarding the Samurai's rollover potential (the case settled); the decision in *Malautea v. Suzuki Motor Corp.*, 148 F.R.D. 362, 375 (S.D.Ga. 1991), in which the court suggested that Suzuki knew of the Samurai's rollover propensity and did nothing to correct it; two separate multimillion dollar verdicts in the case of *Rodriguez v. Suzuki Motor Co.*, where juries determined that the Samurai was unreasonably dangerous due to its rollover propensity (both verdicts were reversed and the case settled); the disclosure of documents from the *Malautea* and *Rodriguez* cases suggesting that Suzuki knew of the Samurai's rollover propensity; and eight years of further SUV testing by CU during which time only the Samurai in 1988 and Isuzu Trooper in 1996 tipped up.

### H. January 1996: 60th Anniversary Issue of Consumer Reports

In its 60th Anniversary issue of *Consumer Reports,* published in January 1996, CU set forth a chronology that contained a picture of the Samurai tilted on two wheels, with the following caption:

> 1986 CU buys its own auto test track in rural Connecticut. Two years later, based on tests conducted there, CONSUMER REPORTS discovers the Suzuki Samurai easily rolls over in turns and rates it Not Acceptable. Sales of the Samurai dwindle away. Since 1936, dozens of products, from chemistry sets and toasters to power mowers and child

safety seats, have been identified as safety hazards and rated Not Acceptable.

The same January 1996 issue also contained a section entitled "Memo to Members," in which CU's President stated that "we still find products that are unsafe: From kerosene heaters to the *Suzuki Samurai* to child safety seats, CONSUMER REPORTS has called them out—and our work goes on." [8]

### I. April 1996: Suzuki Files This Action

On April 11, 1996, Suzuki filed the instant action alleging that CU's ongoing publication of the negative Samurai rating constituted product disparagement.[9] After discovery, CU moved for summary judgment, challenging the sufficiency of Suzuki's evidence that CU had acted with actual malice in its reporting on the Samurai. The district court granted CU's motion and entered judgment in its favor. Suzuki timely appealed.

### II. STANDARD OF REVIEW

■ A grant of summary judgment is reviewed *de novo*. *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001) (en banc). This court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999). We must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant sub-

---

**8.** In November 1995, CU published a car buyers guide on CD–Rom that also reiterated the "Not Acceptable" rating from its July 1988 *Consumer Reports* article.

**9.** After the action was filed, CU continued publicly to refer to the Samurai test, citing the "Not Acceptable" rating in a June 1996 *Consumer Reports* article on SUVs; sending out contribution solicitation cards in August and October 1996 with a photograph showing the Samurai tipped up on two wheels; and referring to the Samurai in a 1996 press conference and article about the Isuzu Trooper.

stantive law. *Devereaux*, 263 F.3d at 1074.

Because this case implicates the First Amendment protections of a media defendant in the context of product disparagement, "[t]he appropriate summary judgment question is whether a reasonable jury could find, by clear and convincing evidence, that [the plaintiff] has shown actual malice." *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir.1998). In answering this question, we "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). "[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in [its] favor. If[the plaintiff] does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The dissent contends that, by applying the well-established summary judgment rules to the actual malice issue on summary judgment, we offend the "independent examination" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This argument, however, conflates the summary judgment standard of review with application of the *New York Times* standard and, as a result, impermissibly weighs the evidence at the summary judgment stage. Under the independent examination rule, we "exercise our independent judgment" in evaluating the lower court's opinion, rather than granting it any deference. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In other words, we review the district court's decision de novo. *See Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir.2001) ("We review the district court's finding of actual malice de novo."); *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir.1997) ("First Amendment questions of 'constitutional fact' compel us to conduct a de novo review." (internal quotation marks and brackets omitted) (quoting *Bose*, 466 U.S. at 508 n. 27, 104 S.Ct. 1949)). This does not mean, however, contrary to the dissent's suggestion, that in the process of exercising our independent judgment, we jettison the procedural rules governing summary judgment when reviewing the grant of summary judgment in First Amendment cases. While it is true that we must independently examine the record when reviewing the grant of summary judgment, starting with *Anderson v. Liberty Lobby*, the Court has been clear that we apply the well-established summary judgment rules to review of the actual malice issue:

> Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson*, 477 U.S. at 255–56, 106 S.Ct. 2505. *See also Masson*, 501 U.S. at 520, 111 S.Ct. 2419 ("On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight

to be accorded particular evidence."). And, as we have noted above, our case law also recognizes the application of the normal summary judgment standards to the actual malice issue. *See Solano v. Playgirl, Inc.,* 292 F.3d 1078, 1082, 1087 (9th Cir.), *cert. denied,* ⸺ U.S. ⸺, 123 S.Ct. 557, 154 L.Ed.2d 443 (2002); *Kaelin,* 162 F.3d at 1039. Thus, contrary to the dissent's suggestion, the independent examination rule of *New York Times* is consistent with our well-established procedural rules governing review of summary judgment motions on the actual malice issue and does not require us to discard the procedural rules designed to preclude the resolution of disputed factual issues at the summary judgment stage.[10]

Thus, although the dissent provides a plausible view of the evidence—that CU acted in good faith as a skeptical consumer watchdog should—it is not our role, at this stage, to take sides in this way. As we discuss below, there is also another plausible view of the summary judgment rec-

ord—that CU "rigged" a test to achieve a predetermined result in order to serve its own pecuniary interests. Because a jury would be entitled to believe the latter view of the evidence, Suzuki's case survives summary judgment, even applying the independent examination standard.

## III. ANALYSIS

 The parties do not dispute that for Suzuki to recover in this case, it must, as a public-figure plaintiff, prove by *clear and convincing evidence* that CU published disparaging statements about the Samurai with *actual malice.*[11] *See Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057–58 (9th Cir. 1990) (stating that claims for product disparagement "are subject to the same first amendment requirements that govern actions for defamation"); *see also Isuzu Motors Ltd. v. Consumers Union of United States, Inc.,* 66 F.Supp.2d 1117, 1124 (C.D.Cal.1999); *Melaleuca, Inc. v. Clark,* 66 Cal.App.4th 1344, 78 Cal.Rptr.2d 627, 637 (1998); *cf. Bose,* 466 U.S. at 513, 104

---

**10.** The cases cited by the dissent do not require otherwise. *See Andersen v. McCotter,* 100 F.3d 723, 725 (10th Cir.1996) (affirming that "[s]ummary judgment is appropriate when there is no genuine issue as to any material fact"); *Secrist v. Harkin,* 874 F.2d 1244, 1251 (8th Cir.1989) ("To withstand a motion for summary judgment, a public official or public figure must present evidence to support a jury finding that he or she has shown with convincing clarity that a defendant acted with actual malice."); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293 (D.C.Cir.1988) ("The question for the court is 'whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.'" (quoting *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505)); *Herbert v. Lando,* 781 F.2d 298, 305 (2d Cir.1986) (affirming summary judgment standards).

Similarly, CU also misstates the applicable standard of review, contending that the normal summary judgment standard does not apply. The cases on which it relies, however,

all involve the review of a judgment rendered after trial. *See Bose,* 466 U.S. at 510–11, 104 S.Ct. 1949; *Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 669 (9th Cir.1991); *Eastwood,* 123 F.3d at 1252. Thus, these cases do not, as CU suggests, require that we abandon the established standard of review in the summary judgment context.

**11.** Suzuki accepts the actual malice formulation of the product disparagement standard for the purposes of this appeal, although it suggests that the Supreme Court has left this issue open, *see Bose,* 466 U.S. at 513, 104 S.Ct. 1949, and reserves the right to challenge the standard on further review. *Amicus* Washington Legal Foundation devotes a substantial portion of its brief to arguing that the First Amendment does not demand a showing of actual malice for product disparagement claims. We decline, however, to address an issue raised only by an *amicus. See Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1141 n. 1 (9th Cir.1998) ("Generally, we will not consider on appeal an issue raised only by an amicus.").

S.Ct. 1949 (assuming without deciding that proof of actual malice is required in a product disparagement action brought by a public-figure plaintiff against a media defendant). Actual malice requires a showing that the defendant made a false statement "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *accord Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

This Court has interpreted *Harte–Hanks* as providing two different tests for proving reckless disregard. *Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896, 900 (9th Cir.1992) (*Masson II* ):

> Where the jury has proof that a publisher "actually had a high degree of awareness of probable falsity," that alone will establish that it "in fact entertained serious doubts as to the truth of [its] publication." Where such direct proof is missing, the jury may nevertheless infer that the publisher was aware of the falsity if it finds that there were "obvious reasons to doubt" the accuracy of the story, and that the defendant did not act reasonably in dispelling those doubts .... As *Harte–Hanks* points out, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category."

*Id.* (quoting *Harte–Hanks,* 491 U.S. at 688, 692, 109 S.Ct. 2678) (brackets in the original).

Suzuki argues that the district court erred in concluding that a reasonable jury could not find that CU's statements regarding the Samurai met the actual malice standard. It contends that the evidence is sufficient to sustain a jury verdict under either test articulated in *Masson II* for proving CU's reckless disregard of the truth.

## A. Awareness of Probable Falsity

■ Suzuki first contends that a reasonable jury could find by clear and convincing evidence that CU had a high degree of awareness of the probable falsity of its statements about the Samurai. It argues that there is a sufficient evidentiary basis showing that CU knew that the Samurai did not tip up more easily than other SUVs and essentially rigged its testing to produce a predetermined result.

At the outset, CU raises a general challenge to Suzuki's argument, suggesting that the overwhelming weight of the evidence demonstrates the skill and dedication of CU in researching and publishing the Samurai story, and therefore militates against any finding of actual malice. CU assails Suzuki for taking "a few facts out of context, which it pieces together in a contrived and inherently implausible fashion without any supporting evidence." It argues that this court should reject Suzuki's arguments as conjectural and places great weight on its own assertions that it absolutely believed in the truth of its statements.

In the summary judgment context, this argument is unconvincing. It is true that CU has offered evidence of its accuracy in reporting the Samurai story—or, at least, in its subjective belief that it accurately reported the story. But its characterization of its own evidence as overwhelming and its disparagement of Suzuki's evidence as out of context begs the question that we must resolve. The fact that CU employees believed in the truth of their negative statements about the Samurai cannot, by itself, defeat summary judgment. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("The defendant in a defamation action ... can-

not ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."); *Solano*, 292 F.3d at 1087 ("we have yet to see a defendant who admits entertaining serious doubt about the authenticity of an article it published"). Rather, the issue is whether there is adequate evidence to support the contrary view—namely, that behind the veneer of accuracy, CU was disseminating the Samurai story with knowledge, or reckless disregard, of its falsity. While it may be true that CU's evidence of meticulous reporting ultimately has more weight than Suzuki's evidence of actual malice, that is not a question to be resolved here. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

Turning to the evidentiary basis for Suzuki's claims, Suzuki contends that there is sufficient evidence that CU "rigged" the tests to produce the rollover result, demonstrating its awareness of the probable falsity of the negative Samurai rating. In support of this argument, Suzuki highlights the testimony of Denison, who stated that Landau, after witnessing Sheehan and Small's clean runs through the long course, said: "If you can't find someone to roll this car, I will." After this comment was allegedly made (and after Sheehan and Small had taken the Samurai through 37 long-course runs without incident), Suzuki notes that Pittle, who was not a CU test driver, decided to drive the Samurai, tipping the vehicle after 10 runs to a cheer from a CU onlooker.[12] Suzuki also points to the fact that CU modified the long course, which it had used since 1973, to replicate the Pittle situation and then resumed its testing of the Samurai until it tipped up—again eliciting statements that can be construed as expressions of satisfaction ("That's it. That looked pretty good." "All right Ricky baby.").

This evidence is adequate to preclude summary judgment. A reasonable jury could find by clear and convincing evidence that CU sought to produce a predetermined result in the Samurai test. The timing of the course modification, the fact that the Suzuki was tested repeatedly until it tipped, and the reactions of CU employees all support such an inference. A permissible inference of reckless disregard follows from this evidence of "rigged" testing—if CU modified the course in order to cause a rollover, a reasonable jury could find that the truthfulness of any subsequent reports was vitiated.

Although it suggests that the facts have been taken out of context, CU does not seriously challenge Suzuki's argument of rigging. CU does question Suzuki's reliance on the Denison testimony, arguing that he had a high regard for CU's ethical standards and did not believe that anyone involved in CU's testing of the Samurai rigged the results. Denison did testify, however, that while he believed CU was honest 99.9 percent of the time, the 0.1 percent that he was excluding was the 1988 test of the Samurai. Moreover, although CU has its own interpretation of why it modified the long course and retested the Samurai, we, of course, cannot credit that interpretation over Suzuki's at the summary judgment stage. The district court did not give adequate credit to this evidence of test-rigging.

Suzuki also contends that evidence of CU's avaricious motives supports an inference of actual malice. It suggests that the evidence reveals that CU was financially overextended due to capital investments in the period leading up to the Samurai report and needed a blockbuster story to raise CU's profile and increase fundraising revenues. It is not disputed that, at the

---

**12.** The record does not indicate whether 10 runs was predetermined by the testing proto- col or whether Pittle simply stopped making further runs after achieving a tip-up.

time of the Samurai story, CU had incurred substantial debt for a new headquarters and that CU has used the Samurai story in its fundraising solicitations.

CU characterizes Suzuki's financial motive argument as an "unsupported accusation" and states that, instead of increasing revenues, CU's pre-publication press conference about the Samurai test actually decreased its sales of *Consumer Reports.* CU further contends that evidence of financial motive does not support a finding of actual malice under the relevant case law. *See Harte–Hanks,* 491 U.S. at 667, 109 S.Ct. 2678 ("Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice."). The district court adopted this argument in granting summary judgment.

We agree with Suzuki, however, that the district court erred in this regard. There is sufficient circumstantial evidence of a financial motive to support the ultimate conclusion of actual malice. While CU is correct that financial motive cannot, by itself, prove actual malice, it nonetheless is a relevant factor bearing on the actual malice inquiry. *See Harte–Hanks,* 491 U.S. at 668, 109 S.Ct. 2678; *Kaelin,* 162 F.3d at 1042. The evidence of financial motive dovetails with the evidence of test-rigging described above. The fact that CU needed to boost its revenues to complete its capital campaign lends credence to Suzuki's contention that CU rigged the Samurai testing to produce the predetermined rollover result.

We conclude that the evidence of motive and test-rigging, in combination, is sufficient to preclude summary judgment and therefore requires reversal.[13]

## B. Purposeful Avoidance

█ Suzuki also argues that there was sufficient evidence for a jury to have concluded under *Masson II* that, in the face of obvious reasons to doubt the accuracy of its Samurai story, CU did not act reasonably in dispelling those doubts, thereby raising the inference that CU knew of the story's falsity. Under this approach, "[i]t is not ... the failure to act reasonably in itself that establishes malice; that failure is only a link in the chain of inferences that could (but need not) lead a jury to conclude that the publisher failed to conduct an investigation because it was already pretty much aware of the falsity." *Masson II,* 960 F.2d at 900. The central inquiry is whether the evidence discloses that a defendant purposefully avoided the truth. *Id.*

First, Suzuki claims that CU had reason to doubt its assertion that the Samurai's rollover propensity warranted a "Not Acceptable" rating. In particular, Suzuki points to the NHTSA decision issued in September 1988 indicating that the Ford Bronco II had a three times greater rollover record than the Samurai, which had a rollover record corresponding to the Chevrolet S–10 Blazer. Additionally, CU learned in 1989 that the Samurai's rollover rate was less than the rollover rate of the

---

**13.** Suzuki also advances a number of additional arguments in support of its contention that the summary judgment record is sufficient to show that CU acted with a high degree of awareness of the probable falsity of its report on the Samurai. Specifically, Suzuki contends that a jury could draw the inference that CU acted with actual malice based on the factual inaccuracies in the Samurai story; CU's premeditation in publicizing false statements about the Samurai; and CU's concealment of evidence contrary to its claim that the Samurai "rolls over too easily." Because the analysis set forth above is dispositive of the first prong of the *Harte–Hanks* test ("a high degree of awareness of probable falsity"), we need not reach Suzuki's remaining arguments in support of reversal based on *Harte–Hanks'* first prong.

Nissan Pathfinder, Toyota 4 Runner, Jeep CJ–7, and Ford Bronco II. Further, in 1992, the Insurance Institute for Highway Safety produced a report showing that the Samurai had a rollover rate lower than that of many other SUVs.

Second, Suzuki contends that CU had sufficient reasons to doubt the validity of the testing procedures it used to determine the negative Samurai rating. Here Suzuki again relies on the NHTSA study criticizing CU's testing procedures for failing to provide a basis for repeatable results and being overly dependent on driver influence. Suzuki also emphasizes the British Department of Transport study echoing these conclusions, as well as statements by Knoll and Sheehan suggesting that at least some CU personnel acknowledged that its testing procedures were overly driver-influenced. Suzuki asserts that, despite these indications that the Samurai rating rested on questionable data and suspect methodological premises, CU took no steps to engage in further investigation, thereby reinforcing the inference of purposeful avoidance. Suzuki faults CU for failing to incorporate instruments into its testing that would record how the driver was steering the vehicle and for never evaluating its test results against real-world crash data. It suggests that CU's failure to do so violated accepted journalistic standards [14] and raises the inference that CU ignored contrary evidence that would confirm the falsity of its claims about the Samurai. The district court rejected much of this evidence, stating particularly that the NHTSA study was not entitled to greater weight than any other

study or opinion regarding testing methods and therefore could not support a claim of actual malice.

In response to the NHTSA report, CU published an article in the November 1988 issue of *Consumer Reports* that addressed the NHTSA's critique of CU's negative Samurai rating. With respect to the issue of the Samurai's rollover rate, CU stated:

According to NHTSA's own Crash Avoidance Research Data file, however, the *Suzuki Samurai's* rate of rollover in single-vehicle accidents is more than double the average for all sport-utility vehicles. In 1986, the most recent year for which there are figures, the *Suzuki* rolled over in 64 percent of all single-vehicle *Suzuki* accidents reported in this data base. The only vehicle that came close to the *Samurai* in rollover involvement is the now-discontinued *Jeep CJ–5* (49 percent). By contrast, the rollover rate for full-sized sedans was only 8 percent.

NHTSA appears to have relied not on its statistics on rollover rates for single-vehicle accidents but on a different data base, one that includes only rollovers involving a *fatality*. Elsewhere, ... [the NHTSA] notes that the *Samurai* was involved in six fatal rollovers per 100,000 vehicles on the road, a record the agency compares favorably with that of the *Ford Bronco II*—19 fatal rollovers per 100,000 vehicles on the road.

CU has learned that the overall rollover rate for the *Bronco II* is high—about the same as that for the *Jeep CJ–5*—but not nearly as high as the *Su-*

14. Relying on expert witness testimony, Suzuki asserts that CU violated accepted journalistic standards in failing to engage in further investigation of contradictory evidence. CU responds that the expert testimony is irrelevant because it is not probative of CU's subjective state of mind. *See, e.g., Harris v. Quadracci*, 856 F.Supp. 513, 519 (E.D.Wis.1994).

Although expert testimony regarding CU's departure from accepted professional standards is not sufficient by itself to establish actual malice, *see Harte–Hanks*, 491 U.S. at 669, 109 S.Ct. 2678, it does shed light on the propriety of CU's response to contrary rollover evidence and, thus, is entitled to be given appropriate weight.

*zuki's.* The higher number of *fatalities* in *Bronco II* rollovers could come about for a number of reasons. The *Suzuki* rolled over at a relatively low speed in our accident-avoidance tests; if *Bronco II* rollovers occurred at higher speeds, one would expect more fatalities per rollover. One would also expect more fatalities if the *Bronco II* were driven more miles, on average, than the *Suzuki.*

Regarding the NHTSA's criticisms of CU's testing protocols, the article went on to state:

> NHTSA did no independent testing of the *Suzuki's* rollover propensity. Rather, it uncritically accepted Suzuki's data, saying Suzuki "demonstrated that the Samurai satisfactorily completed industry accepted ... tests which might be used to assess a vehicle's rollover propensity."
>
> But there are no industry-accepted tests for rollover propensity—a point NHTSA itself makes elsewhere in its letter....
>
> [One] test performed for Suzuki looks superficially like an avoidance maneuver, since the car was run through a slalom course. But in a realistic avoidance maneuver, a car is steered first to the left and then back to the right immediately. In the Suzuki test, the car was steered to the left, then straightened and allowed to recover before returning to the right lane. That is a simple lane-changing maneuver, not an accident-avoidance maneuver.
>
> NHTSA also adopted as its own another of Suzuki's arguments: Using the accident-avoidance maneuver developed by CU, the agency stated, "probably any light utility vehicle could be made to roll over." But NHTSA offered no evidence or independent test results to support such speculation. In fact, no vehicle other than the *Suzuki* has rolled over in

the 10 years we've tested for accident avoidance.

The critical inquiry under *Masson II* is whether CU failed to act reasonably in investigating and responding to contrary studies in a manner that suggested it was attempting purposefully to avoid discovering the truth of the matter. In general, the analysis conducted and published by CU in response to the NHTSA study is not indicative of purposeful avoidance. To the contrary, in the November 1988 article, CU challenged the NHTSA report head on, stating its disagreement in detail and supporting its alternative conclusions with substantive justifications. To the extent that there were contrary rollover statistics, CU analyzed them and explained why they did not warrant a conclusion at odds with its initial assessment of the Samurai. In response to the NHTSA's critique of CU's testing, CU argued that the Suzuki tests upon which the NHTSA relied were flawed. While Suzuki may disagree with CU's discussion of the rollover statistics or its criticisms of Suzuki's own accident avoidance tests, such disagreement does not demonstrate CU's purposeful avoidance of critical facts.

While we agree with CU, however, that much of Suzuki's purposeful-avoidance argument boils down to its disapproval of CU's conclusions, there is one issue that nevertheless precludes summary judgment here. In particular, CU has done nothing to respond to the criticism of its testing procedures as overly influenced by driver input. This evidence formed the basis for the district court's decision in *Isuzu Motors,* in which the court relied heavily on the NHTSA report to deny CU's summary judgment motion, stating that "CU was aware that its tests were significantly reliant upon driver input and skill." *Isuzu Motors,* 66 F.Supp.2d at 1125. Suzuki has pointed to further evidence that some CU

personnel shared this assessment. The issue is whether CU, armed with the knowledge that its tests were potentially flawed in this way, failed reasonably to investigate in such a manner that could lead a jury to conclude by clear and convincing evidence that CU was aware of the falsity of its Samurai report. Drawing all reasonable inferences in favor of Suzuki on this point, CU's failure to address this deficiency with its testing procedure could lead a jury to conclude that it was aware that doing so would disclose the falsity of its negative Samurai rating.

Therefore, we conclude that Suzuki has also raised a genuine issue of material fact as to whether CU purposefully avoided information that would have undermined its assessment of the Samurai's rollover propensity.

## IV. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is reversed and the case remanded for further proceedings.[15]

REVERSED and REMANDED.

GRABER, Judge, concurring in part:

I agree with the majority opinion's theoretical discussion but agree only in part with its application of our standard of review.

### A. *Standard of Review*

The majority opinion employs the proper standard of review. Although the independent examination rule applies at the summary judgment stage, it does not require us to abandon all the usual summary judgment procedures. Instead, we are required to examine independently the entire record in determining whether the non-moving party has presented evidence sufficient to allow a reasonable jury to con-

clude, by clear and convincing evidence, that a public figure has proven actual malice. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1039 (9th Cir.1998).

At the summary judgment stage, the independent examination rule does not allow us to end our analysis by noting that there is "some" or "any" evidence in the record giving rise to a genuine issue of material fact, as we would be permitted to do in a run-of-the-mill civil action. The First Amendment requires us to graft the more demanding "clear and convincing" standard onto our traditional summary judgment analysis and requires us to consider independently whether the non-moving party has presented sufficient evidence to satisfy this demanding standard. But we still are required to view the evidence in the light most favorable to the nonmoving party, and we are prohibited from deciding questions such as credibility, which remain reserved exclusively for the factfinder. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

The dissent points out that the "clearly erroneous" standard of Rule 52(a) does not apply to some findings of fact made after a full trial in a First Amendment case. 292 F.3d at 1206–07 (Ferguson, J., dissenting) (citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). Rather, in First Amendment cases, reviewing courts undertake an independent examination of the record to determine whether the judgment constitutes "a forbidden intrusion on the field of free expression." *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The dissent argues incorrectly that we ig-

15. We, of course, intimate no view of the ultimate outcome on the merits.

nore this directive in our application of the summary judgment standard.

The dissent's interpretation of the independent examination rule would require us to abandon a fundamental tenet of summary judgment procedure, namely, viewing the evidence in the light most favorable to the nonmoving party. None of the cases cited by the dissent requires us to take this drastic step. In fact, the Supreme Court's post-*Bose* decisions clearly illustrate that, whatever the independent examination rule means in the summary judgment context, it does not mean that we must abandon our practice of viewing the evidence in the light most favorable to the nonmoving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence."); *see also Kaelin,* 162 F.3d at 1039, 1041 (holding that the court "must draw all justifiable inferences in favor of [the nonmoving party], including questions of credibility and of the weight to be accorded particular evidence," and that the court is required to "[v]iew[ ] the facts in the light most favorable to [the nonmoving party]" (internal quotation marks omit-

ted)). Thus, it is clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

There are good reasons why courts must apply the independent examination rule differently in the summary judgment context than when reviewing a judgment entered after a full trial. The evidence presented at trial often differs markedly from that which is offered in a party's summary judgment papers. The propositions claimed in affidavits may or may not be proved at trial. Some witnesses turn out to be credible; some do not.[1] Some inferences that seemed tenuous at summary judgment appear quite reasonable in light of the evidence at trial. Even in the First Amendment context, therefore, summary judgment cannot serve as a complete substitute for trials on the merits in all cases. As the Supreme Court stated in *Anderson:*

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. *It by no means authorizes trial on affidavits.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is

---

**1.** In this case, the credibility of a number of CU's employees is of paramount importance to the "actual malice" inquiry. Further, were the jury at trial to disbelieve those employees' explanations of statements made during the testing process, this court could not question the jury's finding. *See Eastwood v. Nat'l Enquirer, Inc.,* 123 F.3d 1249, 1252 (9th Cir. 1997) (noting that the independent examination rule "does not mean we give jury findings no weight; on questions of credibility, which the jury is uniquely qualified to answer, we defer."); *see also Bose,* 466 U.S. at 498,

499–500, 104 S.Ct. 1949 (noting that the independent examination rule is consistent with Federal Rule of Civil Procedure 52(a)'s mandate that " 'due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses' "). Accordingly, viewing the evidence in the light most favorable to the nonmoving party at summary judgment is particularly important in cases such as this one, where the jury could choose to disbelieve the testimony of the moving party's witnesses.

ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). Accordingly, when reviewing a summary judgment ruling on the question of actual malice, we must apply the independent examination rule differently than we would if we were reviewing an actual-malice finding made after a full trial.

### B. *Actionable Statements*

I must part company with the majority opinion, however, on the question of which statements are actionable. There are dozens of allegedly actionable statements in this case. Both the majority and the dissent analyze these statements as a whole, using an all-or-nothing approach. I believe that each statement must be considered separately against the standard outlined above.

Under this analysis,[2] only two of the statements withstand CU's motion for summary judgment.

1. The first of these appeared in an August 20, 1996, CU Background Paper: "In 1988, we developed the "short course" *because we discovered* that the Suzuki Samurai, then undergoing testing, showed a propensity to roll over during our long course AM maneuver." (Emphasis added.) The evidence detailed in the majority opinion is sufficient to allow a rational jury to find, by clear and convincing evidence, that CU developed the short course *before* discovering a rollover "propensity" and *in order to create* a rollover propensity, not *because of* it.

2. The second potentially actionable statement appeared in CU's January 1996 anniversary issue: "1986 CU buys its own auto test track in rural Connecticut. Two

years later, based on tests conducted there, CONSUMER REPORTS *discovers that the Suzuki Samurai easily rolls over in turns* and rates it Not Acceptable." (Emphasis added.) The evidence in the summary judgment record would allow a reasonable jury to find by clear and convincing evidence that what CU discovered was that the Suzuki Samurai did *not* roll over "easily" in turns, but had to be coaxed.

For the reasons explained here and in the majority's opinion, Suzuki has presented sufficient evidence to allow a reasonable jury to conclude, by clear and convincing evidence, that CU made those two statements with actual malice. Summary judgment with respect to those statements was inappropriate.

FERGUSON, Circuit Judge, dissenting:

I respectfully dissent. By failing to apply the full procedural protections afforded by the First Amendment, the majority and concurrence intrude on the field of free expression in two of its most important contexts: consumer protection and public safety.

In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that specific constitutional protections of speech limit the state's power to award damages in libel actions brought by public officials. *Id.* at 283, 84 S.Ct. 710. One method of protecting speech is the actual malice standard, which is set forth by the majority opinion. Majority Op. at 1133–1134; *see also New York Times,* 376 U.S. at 285–86, 84 S.Ct. 710. Another method is the independent examination rule, which requires an appellate court to independently review the whole record, "so as to assure [itself]

---

**2.** Suzuki's claims are untimely with respect to many statements. Others fail to meet the

exacting summary judgment standard used in a First Amendment case.

that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times*, 376 U.S. at 285, 84 S.Ct. 710 (citation omitted). In adopting the actual malice standard and independent examination rule, the Supreme Court noted the importance of protecting "the principle that debate on public issues should be uninhibited, robust, and wide-open...." *Id.* at 270, 84 S.Ct. 710. The Court also recognized that an "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the breathing space they need [ ] to survive." *Id.* at 271–72, 84 S.Ct. 710 (internal quotation marks and citation omitted).

The majority and concurrence undermine these procedural protections by erring in their application of both the actual malice standard and the independent examination rule.

### 1. Independent Examination

The majority and concurrence misunderstand the argument of Consumers Union of United States, Inc. ("Consumers Union") that we must conduct an independent examination of the record under *New York Times.* Majority Op. at 1131 & n. 10. While purportedly applying the "independent examination rule," both the majority and concurrence fail to grasp how the *additional* procedural protection of the independent examination functions and, thus, are unable to apply the rule properly in this case. Moreover, both Judge Tashima and Judge Graber overlook the ongoing debate among courts and legal scholars regarding the applicability of the "independent examination" rule to appeals from

summary judgment motions, commentary which clarifies the significance of the independent examination rule in our analysis at the summary judgment stage.[1] Because the majority and concurrence have demonstrated a limited understanding of the independent examination rule, I provide a brief overview below.

From the outset, it is worth noting that prior to our decision in *Crane v. Arizona Republic*, 972 F.2d 1511 (9th Cir.1992), it was an open question within our circuit whether the independent examination rule applied to appeals from summary judgment. Even after *Crane*, the Supreme Court has recognized that the scope of procedural protections in First Amendment cases remains unclear. *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (recognizing that, although "some procedural requirements are mandated by the First Amendment, and some are not[,]" the Court has not "discovered a general principle to determine where the line is to be drawn.").

However, the application of the independent review rule to a summary judgment determination is the most logical method to address the concerns regarding the chilling of speech expressed in *New York Times. See* 376 U.S. at 278, 84 S.Ct. 710 ("Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive."). As a practical matter, the threat and actual cost of litigation, including attorneys fees, inhibit speech. *See id.* at 278–79, 84 S.Ct. 710; *see also Steaks Unlimited, Inc. v. Deaner,*

---

1. *See, e.g.,* Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases,* 107 Yale L.J. 2431, 2432, 2442–45 (1998); Scott Matheson, Jr., *Procedure in Public Person Defamation Cases: The Impact of the First Amendment,* 66 Tex.

L.Rev. 215, 289–97 (1987); Lee Levine, *Judge and Jury in the Law of Defamation: Putting the Horse Behind the Cart,* 35 Am. U.L.Rev. 3, 50–91 (1985). The debate among the circuits is discussed further below.

623 F.2d 264, 280 n. 76 (3d Cir.1980) ("The cost of litigating a libel action, burdensome on even the largest news organizations, often can cripple smaller news operations."). At times, the costs of a successful defense can be the same or greater than what the damage awards would have been. *See* Lee Levine, *Judge and Jury in the Law of Defamation: Putting the Horse Behind the Cart,* 35 Am. U.L.Rev. 3, 38 (1985). Moreover, the defense costs *prior* to trial can be extraordinarily high. *See id.* at 91.

Because of these costs and their effects on speech, the procedural protection of the independent examination rule is necessary not only for appellate review of post-trial decisions, but also for appellate review of summary judgment decisions.[2] The independent examination rule provides an additional level of protection of the media's First Amendment rights. Moreover, it addresses concerns regarding the chilling effects on speech of successive, costly litigation. *See Steaks Unlimited, Inc.,* 623 F.2d at 280 ("Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster [the goals of] the First Amendment....").

Unfortunately, *Crane* notwithstanding, the applicability of the independent review rule to appeals from summary judgment remains uncertain within our circuit. *See, e.g., Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1039 (9th Cir.1998) (failing to discuss the applicability of the independent review rule). While in the instant case the majority and concurrence grudgingly concede that the independent examination rule applies, this concession is empty. Their analysis differs in no meaningful respect from an ordinary summary judgment appeal, thereby stripping the independent examination rule of its intended purpose and meaning. I would find that a correct application of the independent examination rule to the facts before us reveals that the plaintiff's case must fail on summary judgment. There is simply insufficient evidence in the record as a whole that could support a reasonable jury finding that the plaintiff has shown actual malice on the part of Consumers Union by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## 2. Applying the Procedural Protections Mandated by New York Times

The majority and concurrence incorrectly apply the actual malice standard and undermine the importance of independent review. By doing so, Judges Tashima and Graber permit a forbidden and dangerous intrusion on the field of free speech.

Both Judges Tashima and Graber fail to contextualize Consumers Union's testing of the Samurai within the purpose and mission of the organization. The District Court recognized the importance of doing so when it stated: "The trier of fact could not be expected to disregard the nature of defendant's business—testing and reporting on consumer products—nor would plaintiff so urge, and it would be error for a court to so instruct. Thus, it is clear

---

**2.** In her partial concurrence, Judge Graber contends that "[t]here are good reasons why courts must apply the independent examination rule differently in the summary judgment context than when reviewing a judgment entered after a full trial." Concurrence at 1140. However, Judge Graber's analysis fails to consider the purpose and intent of a summary judgment motion, particularly in a First Amendment case. In First Amendment cases, we must be aware of the dangers associated with the cost of litigation which can stifle expression, particularly by those whose interests are in warning of danger to the public safety.

that, based on the information CU had gathered, it was concerned about the safety of the Suzuki Samurai." Viewed in this context, the actions and words of Consumers Union were appropriate. Consumers Union began its investigation of a product with the assumption that it could or might be unsafe. Once the product had performed in a manner that could be deemed unsafe, Consumers Union tested it more rigorously. Although the events that occurred in this case suggest that Consumers Union's representatives had the intractable, "bulldog" mentality of a consumer advocacy organization, the facts do not evince actual malice as required by the law.

Judge Graber parts with the majority when she concludes that only two of Consumers Union's statements are potentially actionable. With respect to the first statement,[3] Judge Graber notes that "[t]he evidence detailed in the majority opinion is sufficient to allow a rational jury to find, by clear and convincing evidence, that CU developed the short course *before* discovering a rollover 'propensity' and *in order to* create a rollover propensity, not *because of* it." *Id.* at 1143. Because Judge Graber does not specify the evidence she believes supports a finding of actual malice with respect to this statement, and because Judge Tashima does not analyze Suzuki's claims sentence by sentence, I can only infer that Judge Graber is referring to the fact that Consumers Union altered the course, as well as the comments made by Consumers Union employees during the

testing. This evidence is insufficient to support a finding of actual malice, let alone by clear and convincing evidence. At most, the comments of Consumers Union's employees give rise to an inference of bias against the Samurai.[4] Bias alone, however, cannot support a finding of actual malice. *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir.1995).

Moreover, the fact that Consumers Union altered the course cannot supply the "something more" that is required by the exacting actual malice standard. Not only is it undisputed that Consumers Union disclosed the alteration in the article, it is also undisputed that the Samurai tipped over prior to Consumers Union developing the short course. Consumers Union's proffered reasons for developing the short course are completely consistent with the benign explanation that they were simply seeking confirmation of the existing accusations of rollover propensity against the Samurai, which it had exhibited in the early stages of testing.[5]

This is not a case in which Consumers Union contrived to make the Samurai roll over. Suzuki admits that there had been four independent lawsuits in which the vehicle rolled over, including one lawsuit by the Attorneys General of seven states. Certainly, when choosing to republish references to the rating, numerous rollover instances such as these reaffirmed Consumers Union's opinion that the vehicle was "Not Acceptable." In short, the undisputed evidence reveals no evidence of actual malice with respect to the first

---

3. The first statement by Consumers Union that Judge Graber finds potentially actionable is: "In 1988, we developed the 'short course' because we discovered that the Suzuki Samurai, then undergoing testing, showed a propensity to roll over during our long course AM maneuver." Concurrence at 1143.

4. The statements identified by Judge Tashima are as follows: (1) "If you can't find someone

to roll this car, I will." (2) "That's it. That looked pretty good." (3) "All right Ricky baby." Majority Op. at 1135.

5. It is undisputed that the Samurai tipped during the break-in period, as well on the long course when it was driven by an inexperienced driver.

statement that Judge Graber finds potentially actionable.

The second statement that Judge Graber identifies as potentially actionable is as follows: "1986 CU buys its own auto test track in rural Connecticut. Two years later, based on tests conducted there, CONSUMER REPORTS *discovers that the Suzuki Samurai easily rolls over in turns* and rates it Not Acceptable." Concurrence at 1141. Judge Graber states that "[t]he evidence in the summary judgment record would allow a reasonable jury to find by clear and convincing evidence that what CU discovered was that the Suzuki Samurai did *not* roll over 'easily' in turns, but had to be coaxed." *Id.* Because Consumers Union disclosed the basis of the statement, the word "easily" was merely a properly made characterization of the Samurai's performance during the testing. *See Partington v. Bugliosi,* 56 F.3d 1147, 1156 (9th Cir.1995) ("Thus, we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."). Moreover, even if reasonable minds differ about whether the Samurai tipping over four times on an altered course constitutes "easy" rollover propensity, this is evidence only of a subjective word choice, not of actual malice as the First Amendment requires.

Judges Tashima and Graber also misconstrue my argument, contending that I apply the independent examination rule in a manner that swallows the summary judgment standard, and thus engage in a forbidden intrusion on the province of the fact finder. Majority Op. at 1131–1133; Concurrence at 1140–1141. Their accusations reveal their lack of understanding of the way the rule interacts with the summary judgment standard, and the analysis that the rule requires that we apply in First Amendment cases. Were we to apply both standards correctly, we would determine whether there is a genuine issue of material fact as to actual malice under the summary judgment standard. However, in doing so, we would conduct an independent review of the entire record "to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose,* 466 U.S. at 505, 104 S.Ct. 1949; *see also Secrist,* 874 F.2d at 1251 (stating that a court must "make [its] own independent review of the record to ensure the principles of actual malice are constitutionally applied."). Because the independent examination rule allows us to view all of the evidence, and not just that which favors the plaintiff, we give maximum protection to the First Amendment. Far from discarding traditional summary judgment rules, my analysis is consistent with the way the independent examination rule has been applied at the summary judgment stage by other circuits. *See, e.g., Secrist,* 874 F.2d at 1251; *Herbert,* 781 F.2d at 305, 308. Like in *Secrist* and *Herbert,* upon an independent review, the evidence of actual malice in the case before us is paltry and unable to survive a summary judgment motion.

On a broader level, the majority's decision has troubling implications. If taken to its logical end, the majority's reasoning will allow *any* deficiency in a consumer group's test to become the grounds for litigation. This will inhibit the speech of organizations and individuals who would fear voicing their findings and views because of the threat of litigation. *See New York Times,* 376 U.S. at 278–79, 84 S.Ct. 710. Suppression of such speech will cre-

ate less informed consumers and hinder public safety and health. *See Steaks Unlimited, Inc.*, 623 F.2d at 280 (discussing the importance of First Amendment protection for consumer reporting). Moreover, it will give the government the sole voice in this field. In cases, such as this, where the consumer organization disagrees with the government agency's findings or where the agency criticizes the organization's findings, companies will be able to use this fact as proof that the organization was acting with actual malice.[6]

The law is certain that in order to hold Consumers Union is not protected by the First Amendment, there must be clear and convincing evidence that it acted with actual malice toward Suzuki. The appropriate standard on summary judgment in First Amendment cases is not simply whether there are disputed issues of material fact; the test is whether or not a reasonable jury could find by clear and convincing evidence that Suzuki proved actual malice on the part of Consumers Union. Here, no reasonable jury could find clear and convincing evidence of actual malice. *See Kaelin*, 162 F.3d at 1039. After an independent review of the record, it is unquestionable that the District Court constitutionally applied the principles of actual malice. The grant of summary judgment was necessary both to avoid the inhibition of free speech by the media and to protect public safety and health. For these reasons, I would affirm the District Court's decision.

---

**6.** This concern is most likely part of the reason that the District Court stated that the NHTSA study was not entitled to greater weight than any other study or opinion regarding testing methods. The majority, however, chooses to give the NHTSA study greater weight and, thus, discourages the nongovernmental voices in the fields of consumer protection and vehicle safety. Majority Op. at 1138.